## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ERIC DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 11 C 0056** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **MICHAEL J. ASTRUE,** | ) | **Maria Valdez** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Eric Davis's claim for Disability Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Davis's motion for summary judgment [Doc. No. 19] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

# BACKGROUND

## I. PROCEDURAL HISTORY

Plaintiff Eric Davis ("Plaintiff," "Claimant," or "Davis") originally filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on December 27, 2006. (R. 8.) In both applications, he alleged disability beginning July 1, 2006. (*Id.*) Plaintiff's claims were denied initially on March 23, 2007, and upon reconsideration on October 9, 2007. (*Id.*) Plaintiff timely filed a written request for a hearing by an Administrative Law Judge ("ALJ") on November 12, 2007. (*Id.*) Plaintiff appeared and testified at a hearing held on September 22, 2009, April 6, 2010 and September 10, 2010. (*Id.*) Also appearing and testifying on the first day of the hearing were impartial medical expert Dr. Julian Freeman ("Dr. Freeman"), impartial psychological expert Dr. Marva Dawkins ("Dr. Dawkins"), impartial vocational expert Michelle Peters, and Plaintiff's girlfriend, Ms. Leslie Bell ("Ms. Bell"). (*Id.*) Appearing and testifying on the second day of the hearing were impartial medical expert Dr. William Newman ("Dr. Newman"), impartial vocational expert Pamela Tucker, Dr. Dawkins and Plaintiff. (*Id.*) Appearing and testifying on the third day of the hearing were impartial medical expert Dr. Keenan Ferrell, impartial vocational expert Glee Ann Kehr, Ms. Bell and Plaintiff. (*Id.*)

On September 20, 2010, the ALJ denied Plaintiff's claim and found him "not disabled" under the Social Security Act. (R. 28.) The Social Security Administration Appeals Council denied Plaintiff's request for review on November 10, 2010. (R. 1.)

The ALJ's decision thus became reviewable by the District Court under 42 U.S.C. § 405(g), *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), and Plaintiff filed the instant motion on October 3, 2011. [Doc. No. 19.] This matter has been fully briefed since December 5, 2011. {Doc. No. 23.]

## II.    FACTUAL BACKGROUND

### A.    <u>Mr. Davis's Background</u>

Mr. Davis was born on March 19, 1972; at the time he claimed that he was unable to work – July 1, 2006 – he was thirty-four years old. (R. 239.) Davis alleged that he was unable to work due to his mental condition; specifically, he claimed that he had schizophrenia.[1] (R. 268.) In his application for disability insurance benefits, Davis claimed that he worked in 1989, and also worked from 2001 until he was unable to work at Metro Health Care Laundry Services as a linen tech. (R. 240, 269, 1002.) Davis was incarcerated from December 1989 until June 2001. (*Id.*) The record also indicates that Davis was incarcerated for a short period of time in 2004. (R. 1048-51.)

### A.    <u>Lay Testimony</u>

#### 1.    *Davis's Testimony and Reports*

In his Activities of Daily Living Questionnaire, Plaintiff reported that he rarely goes out, attends to personal hygiene once a week, and does not drive. (R. 299-300.) When asked to explain activities he once did but can no longer do, Davis

---

[1] Davis also complained of various physical ailments, but Plaintiff does not take issue with the ALJ's decision regarding those impairments in the instant motion.

said the following: "I use to be able to walk before my knew (*sic*) operation and before the warriors of mazon took over my Temple. Now I'm a servant of durah." (R. 301.) Plaintiff also reported that he lived with his girlfriend, Ms. Bell and his daughter, Jemyria Davis. (R. 302.) In terms of household chores that he performed, Davis reported that he "keep[s] evil out my temple." (*Id.*) He also indicated that he did not go shopping. (*Id.*) Plaintiff indicated that his condition had affected his bathing, hair care or dressing, and said, "I hide cause people see me washing up so I do it probably 1 time." (R. 303.) Plaintiff also indicated that he needed help remembering to take medicine or keep appointments, and the Ms. Bell helped him do so. (*Id.*) Plaintiff reported that he had problems concentrating or thinking, and said that there are "to many other people in my head with me." (*Id.*) Plaintiff also reported that he had problems finishing things that he starts, and said, "I'm scared to do something." (Id.) Plaintiff also reported that he hears voices and sees people who are not around "all the time." (Id.) Plaintiff indicated that the voices and people interfered with his activities, and said that "they don't believe I'm the boss." (*Id.*) Plaintiff indicated that someone was watching him or trying to harm him, and identified them as "the evil soldiers of durah." (R. 304.) Plaintiff reported that he left home "once" and goes "everywhere." (*Id.*) Plaintiff indicated that he could not leave home alone because "[Ms. Bell] don't let me go. She say I'm crazy." (*Id.*) Plaintiff reported that he did not enjoy people or being around them, and indicated that he feels afraid of people. (*Id.*)

In a separate Activities of Daily Living Questionnaire, Plaintiff reported that his mom and friends cooked his meals, and that he did no household chores. (R. 281.) Plaintiff also reported that he "smoke[d] a lot of reefer" and that he needed help remembering to take medicine or keep appointments. (R. 282.) He indicated that he had problems with concentrating or thinking, and explained that there were "too many things in my brain thats talking to me with different things and telling me what to do." (*Id.*) He also indicated that he was forgetful, and explained that "if I put something down my fish steals it." (*Id.*) Plaintiff reported that he heard voices and saw people who were not around, and indicated that they interfered with his activities. (*Id.*) Plaintiff said, "I don't leave my room if I don't have too cause they and my fish follows me around." (*Id.*) In response to a question asking whether he feels as if someone is watching him or trying to harm him, Plaintiff explained that "everybody want all of my golden riches." (R. 283.) Plaintiff reported that he leaves home "about three times a week or sometimes 20." (*Id.*)  He indicated that he could not leave home alone, but then said that he goes by himself sometimes or goes with his mom. (*Id.*) Plaintiff also reported that he was not able to sleep well because he was "paranoid cause somebody is watching me and stealing my pillow." (*Id.*) Plaintiff indicated that he does not enjoy people; he said, "I don't trust people. They trying to steal my riches golden that is. Plaintiff indicated that he is afraid of people because "they don't like [his] fish." (*Id.*)

On the first day of the hearing, Plaintiff testified that he had a seventh or eighth grade education, and discontinued his schooling because he was "in the

streets." (R. 969.) Plaintiff also explained that he was abused by his father. (R. 972.) When the ALJ asked Plaintiff to describe how his mental or physical impairments limited him from working, and then asked if Plaintiff was distracted, Plaintiff said, "People be staring at me all the time." (R. 974.) When the ALJ asked Plaintiff with whom he lived, Plaintiff said, "My friend [Ms. Bell]." (*Id.*) When the ALJ asked if he lived with anyone else, Plaintiff said, "And her kids." (R. 975.) When the ALJ asked whether Plaintiff's stuffed shark stares at him, Plaintiff said, "who told you that?" (*Id.*) After the ALJ explained that he had read about the stuffed shark in the record and asked Plaintiff if he had any interaction with the shark, Plaintiff said that "[i]t used to be my friend, but I don't talk to it no more." (*Id.*) When the ALJ asked Plaintiff if he thought that anyone else was staring at him, Plaintiff said, "[i]t's just like, it's like people always think something funny. You know." (R. 976.) After the ALJ asked if Plaintiff thought that people were laughing at him, Plaintiff said that he hears them laughing at him. (*Id.*) Plaintiff testified that he spends most of his day in his room and that he sleeps a lot. (R. 983.) Plaintiff said that he hears voices and that he communicates with his dead sisters. (R. 985.) He also said that he sees things that are not there, and the medicine does not help all of the time. (R. 986.) Plaintiff testified that he tried to hang himself while incarcerated. (R. 1009.) Plaintiff explained that his stepfather got him his job with Metro Health Care Laundry Services, but that he was not actually working: "He just put me on payroll." (R. 1013.) Plaintiff explained further: "The time that I did go to work, because he said something about that there was [inaudible] he going to have to,

6

like, pick me up and bring me, like, to work for a couple of times so that I could be [inaudible] seen, like, on the hospital site." (R. 1014.) Plaintiff expressed concern that his stepfather might get into trouble. (*Id.*) After the ALJ assured him that his stepfather would not get in trouble, the ALJ asked if Plaintiff was still in contact with his stepfather; Plaintiff said that he had died. (R. 1015.)

On the second day of the hearing, Plaintiff testified that he saw his doctor every week for his mental problems. (R. 1046.) When the ALJ asked if Plaintiff was taking any medication for his mental problems in prison, Plaintiff said, "[t]hey didn't do nothing in jail, they didn't care none about none of that." (R. 1047.) Plaintiff explained that he started living with Ms. Bell after he got out of prison in 2001. (R. 1048.)

On the third day of the hearing, when the ALJ asked whether Plaintiff took care of his daughter, Plaintiff said "I see her." (R. 44.) The ALJ then asked Plaitniff if his daughter lived with him, and Plaintiff said, "[y]eah." (*Id.*) Plaintiff testified that Ms. Bell helped him take care of his daughter, and that his daughter's maternal grandmother helped as well. (R. 44-45.) Plaintiff said that his daughter attended school during the day, and that during the week her maternal grandmother picked her up from school, kept her, and brought her home in the morning. (*Id.*) Plaintiff said that the maternal grandmother takes care of his daughter on the weekend as well. (R. 45.)

## 2.    *Ms. Bell's Testimony and Reports*

Ms. Bell completed a "Function Report" on August 10, 2007 and indicated that she had known Plaintiff for six years. (R. 307.) Ms. Bell reported that Plaintiff doesn't do anything during the day. (*Id.*) She also reported that Plaintiff takes care of his child and that she helps him. (R. 308.) Ms. Bell explained that when she met Plaintiff, "he was already mental." (*Id.*) Ms. Bell indicated that she helps Plaintiff with almost all of his personal care, and that she reminds him to take care of his personal needs and grooming. (*Id.*) Ms. Bell also indicated that Plaintiff does not prepare his own meals or do any household chores. (R. 309.) She reported that Plaintiff goes outside twice per month, and that he walks when he goes out. (*Id.*) Ms. Bell explained that Plaintiff cannot go out alone, and that Plaintiff does not drive because "he will crash." (*Id.*) Ms. Bell reported that Plaintiff does not shop, and that he cannot pay bills, handle a savings account, or use checkbooks or money orders. (R. 310.) In terms of hobbies and interests, Ms. Bell reported that Plaintiff "chew[s] on his tongue" and that de does not do it well. (*Id.*) She also reported that Plaintiff talks to his mother once a week, and that there is nowhere that Plaintiff went on a regular basis. (*Id.*) Ms. Bell indicated that Plaintiff's illness, injuries or conditions affect his ability to talk, understand, follow instructions, see, complete tasks, remember, concentrate, and get along with others. (R. 311.) Ms. Bell reported that Plaintiff is paranoid, that he can only pay attention for ten minutes, and that he does not finish what he starts. (*Id.*) Ms. Bell also indicated that Plaintiff has trouble following written instructions and spoken instructions, and that he does not

get along with authority figures. (*Id.*) Ms. Bell reported that Plaintiff does not handle stress or changes in routine well. (R. 312.)

In a different report, Ms. Bell stated that "some days it's hard for him to walk and he talks to imaginary voices all day." (R. 294.) She also said that Plaintiff "thinks he is a fish and other times he plays in his feces." (*Id.*) Ms. Bell explained that Plaintiff's mental and physical impairments make him "incapable of functioning in society. He constantly talks to imaginary voices. He uses the bathroom on himself. He rarely leaves the house. He believes he is the 'wish master.' He goes to doctors but runs out. I'm trying to get him admitted, but I can only do so much for him." (R. 297.)

On the first day of the hearing, Ms. Bell testified that Plaintiff was her boyfriend and that they lived together. (R. 989.) She said that she was not sure how long they had been living together, but thought that they may have been living together since 2003 or 2004. (R. 991, 993.) At one point, the ALJ said, "[Plaintiff is] very non-responsive. And kind of stares straight out a lot of times, and seems to have, like, a fixed view or fixed stare." (*Id.*) When the ALJ asked if Plaintiff had been like that for a while, Plaintiff said yes, and said that he had been like that "pretty much since I known him for." (*Id.*) Ms. Bell said that Plaintiff stays in his room when he is at home and does not really go out at all. (R. 993-94.) Ms. Bell explained that Plaintiff got his job with Metro Health Care Laundry Services through his stepfather, but explained that Plaintiff was not actually working because he did not like to be around a lot of people. (R. 994.) Ms. Bell later clarified

9

and said that Plaintiff did not work every day, and that it got to a period where he was not going to work at all. (R. 1012-13.) Ms. Bell said that Plaintiff's stepfather would take him to work when he went. (*Id.*) When the ALJ asked whether she knew that Plaintiff's stepfather died, Ms. Bell said that she probably forgot, and that she had "other stuff going on with me also." (R. 1015.) Ms. Bell said that Plaintiff did not drive. (R. 996.) Ms. Bell said that her two kids lived with them, and that no other kids lived with them. (R. 999.) Ms. Bell explained that she cannot leave Plaintiff by himself for very long because he tends to get nervous and impatient. (R. 1004.) Ms. Bell said that Plaintiff talks to himself and converses with imaginary people.

Ms. Bell did not testify on the second day of the hearing. On the third day of the hearing, Ms. Bell testified that she takes care of Plaintiff's daughter, and that the child's maternal grandmother also takes care of her. (R. 48.) During her testimony, the ALJ stated that "the claimant present with a very severe mental impairment. He's not responsive many times in the hearing room, for instance. He looks off to the side, that kind of thing." (*Id.*) After the ALJ asked her if Plaintiff was like that when she first met him, Ms. Bell said, "[n]ot all the way, but he's like that now." (*Id.*) When the ALJ asked her at what stage Plaintiff progressed to his current level of dysfunction, Ms. Bell said, "I'm not a doctor. I don't know that difference in stages. I pretty much just know [Plaintiff]." (R. 49.) The ALJ re-articulated his question: "how long ago was he this bad off in mental functioning?"

(*Id.*) Ms. Bell responded, "[y]ou're saing bad off, to me, I don't know, because I'm around him every day, so, I really wouldn't know how to answer that." (*Id.*)

### 3.  Ms. Jenkins's Report

Ms. Jenkins, Plaintiff's mother, also completed a function report. (R. 273.) She reported that she saw Plaintiff three or four times per week. (*Id.*) Ms. Jenkins said that Plaintiff "mostly stay in the house and watch TV. He cooks, take care of his child. He's really anti-sociable." (*Id.*) Ms. Jenkins reported that Plaintiff was raising his daughter by himself with a little help from her. (R. 274.) Ms. Jenkins indicated that Plaintiff had no problem with his personal care, and that Plaintiff did not need any special reminders to take care of personal needs and grooming, or take his medicine. (*Id.*) Ms. Jenkins also indicated that Plaintiff prepared his own meals, and took care of household chores like cleaning, laundry and ironing. (R. 275.) Ms. Jenkins reported that Plaintiff went outside five times per week. (*Id.*) Ms. Jenkins reported that when he went out, he could do so alone, and indicated that he would walk, ride in a car or use public transportation; she indicated that he would not drive a car or ride a bicycle. (*Id.*) Ms. Jenkins indicated that Plaintiff did drive. (*Id.*) Ms. Jenkins also indicated that Plaintiff shopped for himself, and was capable of paying bills, handling a savings account, counting change, and using checkbooks and money orders. (R. 276.) In terms of hobbies and interests, Ms. Jenkins reported that Plaintiff watches TV. (*Id.*) Ms. Jenkins also reported that Plaintiff spends time with family members, and that there are no places Plaintiff visited on a regular basis. (*Id.*) Ms. Jenkins indicated that Plaintiff sometimes needed to be reminded to

go places, but that he did not require someone to go with him. (R. 277.) In response to a question asking whether Plaintiff had problems getting along with family, friends, neighbors or others, Ms. Jenkins marked "no." (*Id.*) Ms. Jenkins also indicated that Plaintiff's illness, injuries or conditions affect his ability to understand, follow instructions, complete tasks, concentrate and get along with others. (*Id.*) Ms. Jenkins reported that Plaintiff can pay attention for only two minutes, that he cannot finish what he starts, that he does not follow written or spoken instructions well, and that he does not get along with authority figures. (*Id.*) Ms. Jenkins also reported that Plaintiff does not handle stress well. (R. 278.)

### B. <u>Expert Testimony & Medical Evidence</u>

#### 1. *Dr. Castelino Evaluation and Reports*

Dr. Castelino is a staff psychiatrist at Beverly Morgan Park Mental Health Center. (R. 924.) He completed an evaluation on April 30, 2010. (R. 925.) Dr. Castelino reported that he had treated Plaintiff for close to two years. He diagnosed Plaintiff with schizoaffective disorder, and noted that Plaintiff had a history of mood swings ranging from depression to irritability, and that Plaintiff expressed psychotic symptoms such as auditory hallucinations. (R. 924.) Dr. Castelino concluded that Plaintiff appeared to have "very poor social and occupational functioning due to chronic course of his illness." (R. 925.) Dr. Castelino determined that Plaintiff's abilities to remember locations and work-like procedures, to understand and remember very short and simple instructions, to understand and remember detailed instructions, to carry out detailed instructions, to maintain

attention and concentration for extended periods, to interact qppropriately with the general public, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were markedly limited. (R. 926-27.)

Plaintiff's presenting problems included a history of auditory hallucinations, insomnia and mood swings. (R. 956) Dr. Castelino identified the following mood symptoms: sadness, anxiety, extreme irritability, hopelessness, feeling "empty," tired/slowed down. (*Id.*) The doctor also identified the following psychotic positive symptoms: Audio and visual hallucinations, and thought disorder. (*Id.*) Dr. Castelino also indicated that Plaintiff had difficulty with attention, difficulty with concentration, instability in mood, instability in interpersonal relationships, depression, and boredom. (*Id.*) Dr. Castelino's records indicate that Plaintiff had already been prescribed Invega, Depakote and Seroquel. Dr. Castelino recommended medication education, the continuance of the medication Plaintiff was already using, new medication (Cymbalta), and the continuance of individual psychotherapy and individual counseling. (R. 961.) Dr. Castelino diagnosed Plaintiff with schizoaffective disorder. (*Id.*)

On August 1, 2008, Dr. Castelino indicated the following symptoms: loss of interest, tired/slowed down, hallucinations, difficulty with attention and concentration, instability in mood and interpersonal relationships, depression and anxiety. (R. 952.) On October 31, 2008, the doctor recognized many of the same symptoms. (R. 948.) On June 12, 2009, Plaintiff reported that he felt alright, but Dr. Castelino identified the following symptoms: anxiety, hallucinations, difficulty with

13

attention and concentration, and depression. (R. 940.) On October 16, 2009, Dr. Castelino identified the following active problems: anxiety and paranoia. (R. 938.) On January 8, 2010, Dr. Castelino identified the same active problems, and also identified the following symptoms: anxiety, difficulty with attention and concentration, and depression. (R. 932, 934.) On April 30, 2010, Dr. Castelino determined that Plaintiff's schizoaffective disorder was in partial remission. (R. 930.) He identified anxiety and paranoia as Plaintiff's active problems, and anxiety, hallucinations, difficulty with attention and concentration, and depression as Plaintiff's current symptoms. (R. 928, 930.)

### 2. *Dr. Friedson's Evaluation*

On March 2, 2007, Dr. Friedson conducted a mental status evaluation for the Bureau of Disability Determination Services. (R. 336.) Dr. Friedson reported that Plaintiff "presented as quite hostile and belligerent. He really did not cooperate." (R. 337.) Dr. Friedson also reported that Plaintiff was extremely vague about his history. (*Id.*) Dr. Friedson asked Plaintiff about his education. Plaintiff told Dr. Friedson that the only education he ever received was "in the pen." (*Id.*) When Dr. Friedson asked Plaintiff in what penitentiaries her served, Plaintiff said, "all of them." (*Id.*)

When Dr. Friedson asked Plaintiff with whom he lived, Plaintiff said, "Me and everybody else." (*Id.*) When the doctor asked Plaintiff whether he had ever heard voices in his head, Plaintiff said, "I'm not going to answer that question. I hear your voice." (R. 338.) When Dr. Friedson asked Plaintiff to define the word

14

"repair," Plaintiff said, "I'm not answering that. Don't you know the answer to that? Why are you asking me?" (*Id.*) Dr. Friedson reported that Plaintiff was unable to identify a similarity between a piano and a drum. (*Id.*) When Dr. Friedson asked Plaintiff to add five and four, Plaintiff correctly stated nine; but when the doctor asked him to subtract four from ten, Plaintiff stated, "negative sixteen." (*Id.*) When Dr. Friedson asked Plaintiff how many months were in a year, Plaintiff said, "365." (*Id.*)

Dr. Friedson reported that Plaintiff was unable to tell him what medications he had taken. (*Id.*) The doctor also reported that Plaintiff claimed that he saw a psychiatrist while in the penitentiary. (*Id.*) Dr. Friedson stated, "I did get the sense from this claimant's presentation that there may be a long history of antisocial behavior. It was really not clear to me whether there is a truly psychotic process. . . . In the absence of documentation, there may also be validity issues." (*Id.*) Dr. Friedson diagnosed Plaintiff with "possible psychotic disorder NOS" and "probable antisocial personality disorder by history and presentation – primary diagnosis." (R. 339.) Dr. Friedson also reported that, based on his evaluation, Plaintiff did not have the capacity to manage his own finances. (*Id.*)

### 3. Dr. Heinrich's Evaluation

On March 20, 2007, Dr. Heinrich completed a mental residual functional capacity assessment. (R. 368.) Dr. Heinrich identified possible psychotic disorder, NOS and probable antisocial personality disorder as medically determinable impairments. (R. 348. 353.) Dr. Heinrich found that Plaintiff had moderate

15

limitations in maintaining social functioning and maintaining concentration, persistence or pace. (R. 356.) The doctor also found that Plaintiff was moderately limited in his ability to carry out detailed instructions, the ablilty to maintain attention and concentration for extended periods, the ability to interact with the general public, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and the ability to respond appropriately to changes in the work setting. (R. 368-69.)

Dr. Heinrich reported that there was no longitudinal evidence supporting a schizophrenia diagnosis, and that Plaintiff's presentation was not consistent with a schizophrenia diagnosis. (R. 370.) Dr. Heinrich determined that "[h]is behavioral diagnoses appear to be probable antisocial personality disorder and probable cannabis abuse." (*Id.*)

### 4. *Dr. Dawkins's Testimony*

On the first day of the hearing, Dr. Dawkins testified that Plaintiff had been diagnosed and treated for schizoaffective disorder. (R. 1008). Dr. Dawkins opined that Dr. Friedson would have diagnosed Plaintiff with schizoaffective disorder as well had Dr. Friedson had Plaintiff's treating source records at that time. (*Id.*) Dr. Dawkins explained the nature and course of schizoaffective disorder and explained that the condition could have gone untreated for years. (*Id.*) Dr. Dawkins also explained that the personnel at the Illinois Department of Corrections might not have recognized or treated Plaintiff's condition. (R. 1009.) Dr. Dawkins reported

that Plaintiff's treating source records provided a good longitudinal picture, and that Plaintiff had been consistent in presentation. (R. 1016.) She reported that "there's really no doubt that he has the diagnosed mental condition that he has." (*Id.*)

Dr. Dawkins testified that Plaintiff's and Ms. Bell's testimony demonstrated Plaintiff's limitations. (*Id.*) Dr. Dawkins determined that Plaintiff had a moderate limitation in his activities of daily living, and marked limitations in social functioning, and in concentration, persistence or pace. (Id.) Dr. Dawkins said that she found both Plaintiff and Ms. Bell to have been credible. (R. 1018.) Specifically, she said that "what they described would be very characteristic of the disorder itself, and [they are credible] unless they have been reading textbooks on the disorder, [but] I don't think that they would be that sophisticated." (*Id.*)

On the second day of the hearing, Dr. Dawkins testified that she had gone through Plaintiff's prison records and found that there was no indication of any mental related concern while he was incarcerated. (R. 1052.) Dr. Dawkins also reported that she re-reviewed the medical records when Plaintiff was seen on an out-patient basis and "each time he was seen he was far more intact, in terms of his mental status, than he has appeared previously." (R. 1053.) Dr. Dawkins also said that she "put a lot of weight on the testimony of [Ms. Bell]," and indicated that she wanted to examine Plaintiff's most recent mental health records. (*Id.*) Dr. Dawkins said that she did not know if Plaintiff was as functionally dependent on others as he had presented during the hearing. (R. 1054.) She also said that she did not know if

17

that made a difference. (*Id.*) Dr. Dawkins explained that "if the treating source would be just willing to fill out one of those mental status questionnaires that would be truly the most useful information because they would be able to talk about how they see him as functioning."[2] (R. 1056.)

Dr. Dawkins did not testify on the third day of the hearing.

### 5. *Dr. Ferrell's Testimony*

Dr. Ferrell did not testify on either the first or third day of the hearing. On the second day of the hearing, Dr. Ferrell testified that Plaintiff was being treated for an affective disorder, and a possible psychotic disorder. (R. 53.) Dr. Ferrell said, "[g]iven that he is being seen by a treating source and the treating source does indicate that he does suffer from an affective disorder for which he's prescribed the appropriate drugs it is my opinion that he would meet the listing for 12.04" (*Id.*) Dr. Ferrell also opined that it was possible that the very controlled setting during Plaintiff's incarceration explained why Plaintiff's condition was better kept in check and/or went unrecorded. (R. 54.) Dr. Ferrell also said that he gave more weight to the treating source than Plaintiff's mother's report: "it's hard for me to dismiss the treating source who's prescribing medication as opposed to a layperson's observation." (R. 55.)

In terms of the Illinois Department of Corrections consistent failure to identify Plaintiff's condition, Dr. Ferrell explained that

---

[2] The treating source, Dr. Castelino, did fill out such a questionnaire. It is referenced above and is in the record. (R. 924-27.)

> it seems that while he was incarcerated that there was something wrong, but nobody pinpointed it and there seems to have been a lot of just moving around which is what we see with problem prisoners, when there . . . was a problem he was kind of moved and the assessments were not as detailed as they should have been and certain tests weren't run that should have been.

(*Id.*)

### 6. *Plaintiff's Prison Records*

Plaintiff's prison records are extensive (R. 449-903), but they are irrelevant for purposes of this motion. Plaintiff and Defendant agree that there is no evidence of Plaintiff's mental impairment in the records.

## C. **ALJ Decision**

In his findings, the ALJ stated that Davis met the disability insured status requirements of the Social Security Act through December 31, 2011, and further found that he had not engaged in substantial gainful activity since his alleged onset date. (R. 10.) The ALJ found that he suffered from the following severe impairment: status post meniscus tear in the left knee. (R. 11.) The ALJ determined that Plaintiff did not have a mental impairment. (*Id.*) The ALJ determined that Plaintiff's condition did not meet or medically equal any Listing. (*Id.*)

The ALJ determined that Davis had the residual functional capacity

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he: can frequently balance, stoop, kneel, crouch, crawl, or climb; can maintain concentration, persistence and pace with a mild limitation, which is pegged at 95% residual of the workday; can work without social limitation with regard to coworkers and supervisors but can only tolerate

> incidental contact with the public; can transport himself
> on the bus to work and is able to drive himself in a car to
> work; can take care of his personal needs, including
> bathing, toileting, and dressing himself; and
> demonstrates no decompensations.

(*Id.*) After considering the evidence, the ALJ found that "the claimant's medically

determinable impairment could reasonably be expected to cause the alleged

symptoms; however, the claimant's statements concerning the intensity,

persistence, and limiting effects of these symptoms are not credible to the extent

that they are inconsistent with the above residual functional capacity assessment."

(R. 12.)

The ALJ stated that "the record contains no credible or reliable evidence that

the claimant has a mental health impairment." (R. 14.) The ALJ explained that the

"statements made by the claimant's mother, the prison records, and the

contradictions within the testimony of Ms. Bell undercut any contention that the

claimant has a mental health impairment." (*Id.*)

In terms of Plaintiff's treating psychiatrist, the ALJ said the following:

> While the undersigned would normally give significant
> deference to a treating source opinion, the lack of any
> mental health treatment notes prior to 2008 in the record
> shows that Dr. Castelino was clearly relying only on the
> claimant's assertions in forming an opinion of the
> claimant's supposed twenty-year history of mental health
> problems; thus, his opinion is unreliable and based on
> false information from the claimant. Additionally, Dr.
> Castelino did not have any opportunity to review the
> prison records, to consider the third party statements of
> the claimant's mother, or to hear the contradictory and
> impeaching statements made at the hearing by Ms. Bell.

> Moreover, Dr. Castelino's own sparse notes hardly
> support such severe limitations as he opined.

(R. 20.) The ALJ accorded Dr. Castelino's opinion no weight. (*Id.*) The ALJ also

determined that the doctor's treatment records, as opposed to his evaluation,

supported his RFC. (R. 26.)

The ALJ discussed Dr. Friedson's evaluation briefly, but did not indicate any

weight he might have given it. (R. 15.) The ALJ emphasized that the doctor opined

that there might be a validity issue absent documentation supporting Plaintiff's

claims.(*Id.*)

The ALJ stated that the opinion of Dr. Ferrell was not reliable because he

based his medical opinion on Dr. Castelino's opinion. (R. 20.) The ALJ did not find

persuasive Dr. Ferrell's explanations as to how the Department of Corrections

personnel might have failed to recognize or ignored Plaintiff's condition. (*Id.*)

In terms of the weight accorded to Dr. Dawkins's opinion, The ALJ stated:

> While the undersigned appreciates and credits Dr.
> Dawkins testimony about the nature of schizoaffective
> disorder, the undersigned does not credit her unsupported
> opinion about the supposed inefficacy of the Department
> of Corrections medical personnel and her speculation
> about what Dr. Fried[son] might have done. To the extent
> that her first day's opinion was almost entirely based on
> speculation and on the testimony of Ms. Bell and the
> claimant, the undersigned accords it little weight, because
> they are not credible. While she altered her position
> somewhat on the second day . . . she continued to place a
> lot of faith in Ms. Bell's testimony.

(R. 26.) The ALJ also stated that Dr. Dawkins was not as sure of her opinion on the

second day of the hearing. (*Id.*)

The ALJ discussed the findings of Dr. Heinrich, and agreed with him "to the extent that the record as it then existed did not support a diagnosis of schizophrenia and to the extent that the claimant can perform work as Dr. Heinrich described." (R. 19.) However, the ALJ stated that he "disagrees that the claimant even has a mental impairment and, consequently, accords little weight to Dr. Heinrich's opinion." (*Id.*)

The ALJ found that Plaintiff was not a credible witness. (*Id.*) The ALJ stated that the "entire time that the claimant testified, he seemed to be doing his best to appear very nonresponsive and detached." (R. 16.) The ALJ also explained that some of the Plaintiff's statements about his physical condition were contradictory. (R. 19.)

The ALJ also found Ms. Bell to lack credibility. (R. 19.) He pointed out that her reports and testimony conflicted with the report provided by Ms. Jenkins. (R. 21.) He also claimed that Ms. Bell's testimony was contradictory. (R. 20.) The ALJ accorded Ms. Bell's written report no weight because her hearing testimony was "very incredible." (R. 21.)

The ALJ accorded Ms. Jenkins report "good weight." (*Id.*) He found that Ms. Jenkins's "report of observations of her son [were] supported by the other credible parts of the record, especially the testimony Dr. Newman, the prison records, and the lack of credibility of Ms. Bell and the claimant." (R. 20-21.) The ALJ explained that the record "does not disclose what motivation Ms. Jenkins may have to report so clearly that the claimant is functional if such were not true." (R. 21.)

The ALJ determined that Plaintiff was unable to perform any past relevant work, but found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. 26-27.) Consequently, the ALJ concluded that Plaintiff was not disabled. (R. 28.)

## DISCUSSION

### I.  ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.*

Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.     JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence

with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.   ANALYSIS

In his motion for summary judgment, Davis alleges a number of errors related to the ALJ's determination, including: (1) the ALJ's determination that there was no severe mental impairment was erroneous; (2) the ALJ's credibility determinations were flawed; (3) the ALJ improperly gave no weight to the opinion of Plaintiff's treating psychiatrist; and (4) the ALJ improperly weighed medical opinions and evidence.

## A.    <u>Mental Impairment Severity</u>

At step two of the disability five-step analysis, the ALJ is required to determine whether the claimant's impairment is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c).

Plaintiff complains that the ALJ's determination that Plaintiff had no mental impairment, much less a severe one, is contradicted by the evidence of record and the ALJ's own findings. As the Court discusses below, the record does contain evidence of a mental impairment. Furthermore, the ALJ's finding that Plaintiff could tolerate only incidental contact with the public does seem inconsistent with the conclusion that Plaintiff had no severe mental impairment. However, a "finding at step two that a medical condition is severe 'is merely a threshold requirement.'" *Cole v. Astrue*, No. 09 C 2895, 2011 WL 3468822, at *6 (N.D. Ill. Aug. 8, 2011) (quoting *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)). By finding one impairment to be severe, as the ALJ did here, he "is later obligated to consider the total effect of all of a claimant's impairments, both severe and non-severe." *Id.* (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)). Therefore, incorrectly classifying an impairment as non-severe is not reversible error so long as the ALJ continued with the sequential process. *Daniels v. Astrue*, No. 10 C 5820, 2011 WL 3439269, at *8 (N.D. Ill. Aug. 4, 2011) (citing *Perez v. Barnhart*, No. 02 C 6876, 2003 WL 22287386, at *9 (N.D. Ill. Sept. 30, 2003)). Although Plaintiff raises

various arguments relating to the ALJ's consideration of the medical evidence regarding Plaintiff's mental condition, Plaintiff has not shown how the ALJ's failure to identify his severe impairment altered the ALJ's approach to the remaining evaluative steps, and Plaintiff's arguments are more properly assessed in the next three sections. *Cole*, 2011 WL 3468822, at *6.

## B.    <u>Credibility and Consideration of Lay Opinion</u>[3]

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.'"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'"

---

[3] Plaintiff does not directly attack the ALJ's credibility determination and consideration of lay opinion, but Plaintiff's arguments concerning the ALJ's consideration of medical evidence implicate the ALJ's conclusions regarding the credibility of Plaintiff, Ms. Bell and Ms. Jenkins. As such, the ALJ's findings must be evaluated and doing so in a separate section provides for a less convoluted evaluation.

*Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting

*Zurawski*, 245 F.3d at 887-88).

When assessing the credibility of an individual's statements about symptoms

and their functional effects, an ALJ must consider all of the evidence in the case

record. *See* SSR 96-7p.[4] "This includes . . . the individual's own statements about the

symptoms, any statements and other information provided by treating or examining

physicians or psychologists . . . and any other relevant evidence in the case record."

*Id.* at *2. In instances where the individual attends an administrative proceeding

conducted by the adjudicator, the adjudicator may also consider his or her own

observations of the individual as part of the overall evaluation of the credibility of

the individual's statements. *Id.* at 5.

### 1. *Plaintiff's Credibility*

In one part of his decision, the ALJ found that Plaintiff was not a credible

witness. (R. 19.) In support of his conclusion, the ALJ explained that although

Plaintiff claimed that he tried to kill himself while in custody, there was nothing in

the prison records that indicated that Plaintiff attempted suicide. (R. 18.) The ALJ

emphasized the fact that the prison records reflect no complaints about mental

health during Plaintiff's incarceration. (R. 18-19.) The ALJ also pointed out that

---

[4] Interpretive rules, such as Social Security Regulations ("SSR"), do not have
force of law but are binding on all components of the Agency. 20 C.F.R. §
402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

Plaintiff's claim that he could only walk one-half of a block at a time was contradicted by other evidence in the record. (R. 19.)

Additionally significant to the ALJ's credibility determination was Plaintiff's "interjection" during Ms. Bell's testimony. Plaintiff interrupted Ms. Bell's explanation of the nature of Plaintiff's work with his stepfather and explained that Plaintiff did not go to work on a daily basis, and that his stepfather only required him to go to work so as to keep up the appearance that Plaintiff was working. (R. 17, 1013.) In his analysis of the testimony, the ALJ concluded that "[i]t is obvious that either (a) Ms. Bell was lying under oath when she stated that either she or the stepfather would drive the claimant to work every day or (b) the claimant was lying to cover up his functionality for the several years he worked at the laundry after the alleged onset date." (R. 17.)

Finally, concerning Plaintiff's appearance and demeanor, the ALJ stated that "[t]he entire time that the claimant testified, he seemed to be doing his best to appear very nonresponsive and detached. He would stare with a fixed, vacant look on his face; his responses to questions were very delayed or not even forthcoming unless the question (*sic*) were repeated." (R. 16.)

The ALJ's aforementioned credibility determination is supported by the record; however, it is difficult to reconcile it with the ALJ's other credibility determination:

> The claimant initially alleged disability due to schizophrenia and a left leg injury, which allegedly left him with the following limitations: disliking being around

others, feeling as if others are looking at him and laughing at him, disliking leaving his house, getting occasional sharp pains in his legs, swelling in his leg, and conversing with a stuffed animal shark in his bedroom. At the reconsideration level he alleged that some days he experienced difficulty walking and alleged that he talked frequently with imaginary voices. It was also alleged at that time that the claimant would frequently defecate on himself and play with the feces.

After consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

(R. 12.) Here, the ALJ indicated that Plaintiff was credible to some extent. Unfortunately, the extent to which Plaintiff is credible is hopelessly unclear. The ALJ's position, on the one hand, is that Plaintiff is not credible to the extent that his claims are inconsistent with the RFC.[5] On the other hand, however, the ALJ concedes that claimant's impairment could reasonably be expected to cause Plaintiff to feel as if others are looking and laughing at him, to dislike leaving his house, to converse with a stuffed animal shark and other imaginary voices, and to play with his feces, among other things. At least some of these credited symptoms are directly

---

[5] The template that the ALJ utilized to state that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent" with the RFC has been subject to criticism because of its meaninglessness and the circular logic that it embraces. *See Bjornson v. Astrue*, — F.3d —, 2012 WL 280736, at *4-5 (7th Cir. Jan. 31, 2012) (finding the template to "get[] things backwards," and be "meaningless boilerplate" that "implies that ability to work is determined first and is then used to determine the claimant's credibility").

at odds with the RFC, thus the ALJ's determination of credibility is internally inconsistent.

What is most problematic with the ALJ's treatment of Plaintiff's credibility is that the ALJ conflated credibility and reliability. Generally, the credibility determination concerns whether a disability claimant is truthfully presenting his symptoms and limitations or whether he is intentionally misrepresenting or exaggerating them. "Reliability," on the other hand, is a more expansive concept and also implicates an individual's *capacity* to describe or explain various facts about himself or his environment. Of course, the words are synonymous in many cases; in others, however, it is possible for an individual to unreliable even though one is trying to tell the truth. An individual's reliability might be compromised by memory, perspective, time, sensory capability, intelligence and/or competence.

In this case, several portions of the ALJ's decision suggest that he referenced aspects of what might be considered Plaintiff's unreliability to make conclusions about his credibility. Plaintiff claims to suffer from schizophrenia, which, among other things, means that his grip on reality may not be as firm as that of a "normal" person. While some of Plaintiff's claims may suggest that he lacks credibility, some of those very same claims may serve to support the notion that he is unreliable *because of* his alleged psychological condition. This is not to say that claimants who allege mental disease or defect are immune from having their credibility questioned; instead, ALJ's need to distinguish between credibility and reliability in particular cases. An ALJ may not select and discuss only the evidence that favors

his ultimate conclusion. *Herron*, 19 F.3d at 333. Likewise, when evidence is capable of supporting multiple conclusions, an ALJ should not consider and discuss only those that align with his decision.

### 2. *Ms. Bell's Credibility*

Pursuant to 20 C.F.R. § 404.1513, Ms. Bell is considered an "other non-medical source." 20 C.F.R. § 404.1513(d)(4). Furthermore, 20 C.F.R. § 404.1529 states that information that "other persons provide about [the claimant's] pain or other symptoms . . . is . . . an important indicator of the intensity and persistence of [the claimant's symptoms]" and will be taken into account. 20 C.F.R. § 404.1529(c)(3). When an ALJ fails to believe lay testimony about a claimant's symptoms, he should discuss the testimony specifically and make explicit credibility determinations. *Behymer v. Apfel*, 45 F. Supp. 2d 654, 663-64 (N.D. Ind. 1999). Such testimony "is subject to the same credibility determinations as is any other testimony or evidence." *Jones v. Chater*, No. 95 C 4143, 1996 WL 390246, at *6 (N.D. Ill. July 9, 1996). In order to reject the testimony, the ALJ must specifically conclude that the testimony is not credible and provide a minimal level of articulation of his reasons. *McGee v. Bowen*, 647 F. Supp. 1238, 1246 (N.D. Ill. 1986). Generally, court should defer to the ALJ's credibility determinations unless it is patently wrong, but a reviewing court has more latitude in reviewing credibility determinations "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

In this case, the ALJ considered the reports and testimony of Ms. Bell and accorded her written opinion no weight and determined that she was not a credible witness. (R. 19, 21.) The ALJ provided several reasons for his conclusion; all are flawed. First, the ALJ stated that "Miss Bell testified on the first day of the hearing that the claimant was as dysfunctional when she first met him as he was at the hearing. She later changed her testimony during the third day of the hearing." (R. 14.) Ms. Bell's alleged contradiction is not as clear as the ALJ presents it.

On the first day of the hearing, the ALJ stated that Plaintiff was "very nonresponsive. And kind of stares straight out a lot of times, and seems to have, like, a fixed view or fixed stare." (R. 991.) Then the ALJ asked, "Has he been like that for a while?" In response, Ms. Bell said "yes." (*Id.*) The ALJ then asked, "How long has it been like that?" Ms. Bell responded, "Been like that pretty much since I known him for." (*Id.*) The ALJ then asked, "So when you first met him he had that kind of response, or that kind of look?" Ms. Bell responded, "Not, he's pretty much comfortable with me. That's why I'm able to take care of him. But with people –" (Id.) The ALJ interrupted and said, "No, I understand that, but I'm just getting to, you know, when I ask him questions today, his response time is delayed. . . . He's answering me about three or four seconds later. . . . So is this how he was when you first met him?" (R. 992.) Ms. Bell responded, "Yeah . . . pretty much." (*Id.*) Then, on the third day of the hearing, the ALJ stated, "Now, the claimant presents with a very severe mental impairment. He's not responsive many times in the hearing room, for instance. He looks off to the side, that kind of thing." (R. 48.) Then the

33

ALJ asked Ms. Bell, "Was he like that when you first met him?" Ms. Bell answered, "Not all the way, but he's like that now." The ALJ then said, "Let me put it another – how long ago was he this bad off in mental functioning, I guess is what I'm getting to. How long ago was it?" (R. 49.) Ms. Bell responded, "You're saying bad off, to me, I don't know, because I'm around him everyday, so, I really wouldn't know how to answer that." (*Id.*) Ms. Bell's answers are relatively easy to reconcile. Even if one interprets them in such a way that some level of contradiction is implicated, the inconsistency is a reasonable one. Furthermore, in his decision, the ALJ stated that Ms. Bell testified on the first day of the hearing that claimant was "as dysfunctional" as when she first met him, but Ms. Bell's alleged contradiction only references Plaintiff's delayed response time.

Second, claiming another contradiction, the ALJ stated that "on the first day of the hearing she said that, other than her own two children, no other children resided at their three-flat. . . . It was not until the third day of the hearing that Ms. Bell admitted the claimant's daughter lived with them." (R. 17.) At no point in any of the hearings did Ms. Bell state that the claimant's daughter lived with them. Instead, when the ALJ asked, "do you take care of the daughter of the claimant?" (R. 48.) Ms. Bell responded, "yes." (*Id.*) The ALJ then said, "does anybody else take care of the daughter?" (*Id.*) Ms. Bell responded, "her grandmother" and clarified that she was referring to the child's maternal grandmother. (*Id.*) The ALJ did not even inquire about the child's living arrangements. It is worth noting that Ms. Bell's

testimony on the matter is perfectly consistent with her written report, (R. 308), and with Plaintiff's testimony.[6] (R. 974-75.)

Third, the ALJ called Ms. Bells' credibility into question when he stated that "it is difficult to believe that Ms. Bell . . . would not know or forget that their meal ticket for four years, the stepfather of her boyfriend, had died." (R. 17.) The analytical problems in this claim are numerous: the ALJ did not know the nature of the relationship between Ms. Bell and Plaintiff's stepfather and did not inquire about it; the ALJ seems to believe Plaintiff's claim that the stepfather is actually dead when he might not be;[7] and the ALJ ignores the fact that, even if the stepfather was her "meal ticket" while Plaintiff worked with him, the stepfather may not have been important to Ms. Bell after Plaintiff's employment ended. Furthermore, the ALJ fails to explain why Ms. Bell would lie about not knowing or forgetting that Plaintiff's stepfather had died.

Fourth, the ALJ stated that Ms. Bell lacks credibility because her statements are contradicted by other evidence. The ALJ points out that Ms. Bell said that Plaintiff does not drive, but Plaintiff's mother said that he did. (R. 17.) The Court

---

[6] During the third hearing, Plaintiff does say that his daughter lives with him, (R. 44), but he also explains that his daughter is in school during the day, and that her maternal grandmother picks her up from school, and keeps her and brings "her home in the morning." (R. 45.) Plaintiff said that happens three days during the week and that his daughter lives with her maternal grandmother on the weekend. Plaintiff's testimony suggests that his daughter actually lives with her maternal grandmother and that she visits Plaintiff and occasionally spends the night. The ALJ also does not account for the fact that a year passed between the first and third hearings.

[7] That the stepfather may not be dead does not automatically call Plaintiff's credibility into question, especially in light of Plaintiff's alleged mental instability.

will address the reliability of Plaintiff's mother's report below; for now, it is sufficient to point out the ALJ neglects to mention or consider that Ms. Bell's testimony regarding Plaintiff's driving, (R. 996), was consistent with her own reports, (R. 309), and Plaintiff's reports, (R. 300). Similarly, the ALJ pointed out that "Ms. Bell stated [in her written opinion] that the claimant lives with her, in contrast to what [Plaintiff's mother] reported." (R. 21.) The ALJ credited Plaintiff's mother's report automatically even though Ms. Bell's report is consistent with her own testimony, (R. 989), Plaintiff's report, (R. 302), and Plaintiff's testimony. (R. 974.) The ALJ also questioned Ms. Bell's credibility because, "while Ms. Bell claimed that the claimant was as mentally dysfunctional at the time she met him in 2001 as he was at the hearing, the prison records tell otherwise." (R. 18.) The ALJ's analysis is unpersuasive. As is mentioned above, Ms. Bell said nothing about Plaintiff's general mental dysfunction; rather, Ms. Bell made a qualified statement indicating that Plaintiff had been relatively non-responsive since she met him. (R. 992) Also, while the fact that Plaintiff's prison records do not reveal Plaintiff's mental problems or psychiatric treatment may not bolster Ms. Bell's credibility, it does little, if anything, to impugn it.

### 3. *Plaintiff's Mother's Credibility*

Plaintiff's Mother, Ms. Jenkins, did not testify at any of the hearings. She submitted a third party function report, (R. 273-80), which the ALJ accorded "good weight":

> After reviewing the entire record, observing the claimant, and hearing the contradictory testimony of Ms. Bell, the undersigned finds that Ms. Jenkins report of observations of her son are supported by other credible parts of the record, especially the testimony of Dr. Newman, the prison records and the lack of credibility of Ms. Bell and the claimant.

(R. 20-21.) In order to credit Ms. Jenkins's report, the ALJ had to engage in a selective approach to the record, whereby he ignored any evidence that was inconsistent with Ms. Jenkins statements and assigned little to no significance to her report's internal inconsistencies.

As is mentioned above, Ms. Jenkins's reports on Plaintiff's ability to drive and on his living arrangements conflict with the accounts provided by both Ms. Bell and Plaintiff himself. The ALJ does not explain why Ms. Bell's and Plaintiff's statements on those issues lack credibility, and the ALJ fails to consider that both Ms. Bell and Plaintiff are better equipped to make statements regarding Plaintiff's living arrangements and driving ability. Ms. Jenkins also reported that Plaintiff was able to pay bills, handle a savings account, and use a checkbook. (R. 276.) But Ms. Bell reported otherwise, (R. 310), and Dr. Friedson made clear in his evaluation that Plaintiff "does not have the capacity to manage his own finances." (R. 339.) Ms. Jenkins reported that no one has to accompany Plaintiff when he leaves his residence. (R. 277.) But Ms. Bell reported otherwise, and Plaintiff himself explained that he was not allowed to leave his apartment alone. (R. 304) Ms. Jenkins also indicated that Plaintiff was raising his daughter by himself "with a little help from"

her, (R. 274), but both Plaintiff and Ms. Bell reported and testified that this was not the case. (R. 44-45, 48.)

In terms of the internal inconsistencies in Ms. Jenkins's report, she indicated that Plaintiff did not have any problems getting along with family, friends, neighbors or others. (R. 277.) On the same page, she indicated that Plaintiff's illness, injuries or conditions do affect his ability to get along with others. (*Id.*) Ms. Jenkins also reported that when Plaintiff leaves his apartment, he either walks, uses public transportation or rides in a car; she indicated that he did not drive when he leaves his apartment. (R. 275.) However, Ms. Jenkins also indicated, in response to a different question, that Plaintiff does drive. (*Id.*) Ms. Jenkins also stated that Plaintiff prepares all of his own meals (including sandwiches, frozen dinners, and complete meals with several courses), (R. 275), but later indicated that he does not follow written instructions like a recipe well. (R. 277.) Ms. Jenkins reported that Plaintiff does all of the household chores ("cleaning, laundry, ironing, etc."), and does his own shopping for food and clothes, (R. 275-76); however, she later indicated that Plaintiff can only pay attention for two minutes, and that he does not finish things that he starts (like "a conversation, chores, reading, watching a movie"). (R. 277.) Ms. Jenkins also indicated that Plaintiff's illness, injuries or condition affect his ability to complete tasks, concentrate, understand and follow instructions. (R. 277.)

In crediting her report, the ALJ stated that "[t]he record does not disclose what motivation Ms. Jenkins may have to report so clearly that the claimant is

functional if such were not true." (R. 21.) First of all, it is worth noting that significant portions of her report indicate that Plaintiff is *not* all that functional. Secondly, the ALJ again fails to consider the role of reliability, as opposed to credibility. Ms. Jenkins's report's lack of support in the record and its internal inconsistency does not necessarily mean that Ms. Jenkins is lying; instead, it may simply imply that she is a poor source for some of the information regarding Plaintiff's abilities and daily activities.

Additionally troubling is the ALJ's own inconsistency regarding Ms. Jenkins's report. While it was problematic enough for the ALJ to accord her report "good weight" and employ it to discredit the testimony of others, it was doubly problematic for the ALJ to credit her report and then ignore significant details within it that happened to conflict with his conclusions. The ALJ fails to mention almost every detail of Ms. Jenkins's report that does not coincide with his findings.

### C.    <u>Plaintiff's Treating Psychiatrist</u>

On issues not reserved to the Commissioner, a treating doctor's opinion "receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* (quoting *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011)). Even if there are sound reasons for refusing to give a treating physician's assessment controlling weight, the ALJ is "required to

determine what value the assessment did merit." *Id.* (citing 20 C.F.R. §

404.1527(d)(2)).

Plaintiff argues that the ALJ erred in giving no weight to the opinion of Dr.

Castelino, Plaintiff's treating psychiatrist. Defendant maintains that the ALJ

provided "good reasons" for assigning no weight to Dr. Castelino's opinion. The ALJ

explained that

> While [he] would normally give significant deference to a
> treating source opinion, the lack of any mental health
> treatment notes prior to 2008 in the record shows that Dr.
> Castelino was clearly relying only on the claimant's
> assertions in forming an opinion of the claimant's
> supposed twenty year history of mental health problems;
> thus his opinion is unreliable and based on false
> information from the claimant. Additionally, Dr.
> Castelino did not have any opportunity to review the
> prison records, to consider the third party statements of
> the claimant's mother, or to hear the contradictory and
> impeaching statements made at the hearing by Ms. Bell.
> Moreover, Dr. Castelino's own sparse notes hardly
> support such severe limitations as he opined.

(R. 20.) The ALJ's explanations for assigning no weight to Dr. Castelino's opinion do

not amount to "good reasons."

The ALJ does not explain what made Dr. Castelino's "sole" reliance on

Plaintiff's assertions clear. It is apparent from Dr. Castelino's reports that many of

his conclusions were based on Plaintiff's demeanor, affect, attitude, mood, and

various other observable features. Of course, "[a]lmost all diagnoses require some

consideration of the patient's subjective reports, and certainly [Plaintiff's] reports

had to be factored into the calculus that yielded the doctor's opinion." *McClinton v.*

40

*Astrue*, 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012). The ALJ fails to point to anything that suggests that the weight Dr. Castelino accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable. Additionally, the ALJ's inconsistent credibility determination affects his decision to accord no weight to Dr. Castelino's opinion. The ALJ explains that the doctor's opinion was based on false information from the claimant, but the ALJ himself found that Plaintiff's report of his symptoms was credible to some extent. (R. 12.) Also, as is mentioned above, some of Plaintiff's "false information" may have been provided to the doctor as a result of Plaintiff's unreliability, rather than his lack of credibility. Presumably, psychiatrists are aware of the distinction.

Dr. Castelino did not have any opportunity to review Plaintiff's prison records, statements of the Plaintiff's mother, or the statements made at the hearing by Ms. Bell, but this is not a "good reason" for discounting the doctor's opinion. While the prison records may have been useful and/or insightful, a doctor is not required to examine every medical record in a patient's history in order for his opinion to be considered valid. Furthermore, that the prison records do not reflect any mental illness does not establish that Dr. Castelino's opinion is flawed. Similarly, Dr. Castelino was not required to take Plaintiff's mother's report under consideration; and had he done so, the doctor would have found substantial support for a number of his conclusions.[8] Dr. Castelino was also not required to hear Ms.

_____

[8] For example, Ms. Jenkins indicated that Plaintiff's illness, injuries or conditions affect his ability to understand, follow instructions, complete tasks, concentrate and get

Bell's testimony in order to issue an opinion. The ALJ failed to explain how the "contradictory" statements of Ms. Bell should affect the weight accorded Dr. Castelino's opinion, and the Court's analysis above suggests that no aspect of her testimony casts the particulars of his opinion into any doubt. In fact, even if it were clear that Ms. Bell lied in an attempt to secure disability benefits for her boyfriend, it is not apparent how such duplicity would undermine the psychiatrist's psychological findings.

The ALJ's argument that Dr. Castelino's sparse notes failed to support the severe limitations the doctor found is the ALJ's most reasonable argument. While the doctor could have afforded to be more verbose in his findings, however, his notes are sufficient. As is detailed above, Dr. Castelino took a report from Plaintiff, noted his symptoms, conducted a mental status evaluation, identified specific problems, made diagnoses, and stated treatment recommendations after each of Plaintiff's visits to Beverly Morgan Park Mental Health Center. (R. 928-62.) Dr. Castelino also completed a "Medical Assessment of Condition and Ability to do Work-Related Activities" form and a "Mental Residual Functional Capacity Assessment." (R. 924-27.) The doctor explained that Plaintiff had a history of mood swings ranging from depression to irritability, and that Plaintiff expressed psychotic symptoms such as auditory hallucinations. (R. 924.) Dr. Castelino diagnosed Plaintiff with

---

along with others. (R. 277) Ms. Jenkins also reported that Plaintiff can pay attention for only two minutes, that he cannot finish what he starts, that he does not follow written or spoken instructions well, and that he does not get along with authority figures. (*Id*.) Ms. Jenkins also reported that Plaintiff does not handle stress well. (R. 278.)

schizoaffective disorder. (*Id.*) Based on his findings, the doctor concluded that Plaintiff was markedly limited in the following areas: the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 926-27.) The doctor's notes supported his findings.

Even if the ALJ's reasons for discounting Dr. Castelino's opinion amounted to the "good reasons" required to do so, the ALJ did more than merely discount the opinion of the treating psychiatrist: the ALJ accorded it no weight. Without a doubt, the doctor's opinion merited some weight, and the ALJ was obligated to determine the opinion's value. *Scott*, 647 F.3d at 739 (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ neglected to do so.

### D. <u>Other Medical Opinions and Evidence</u>

Plaintiff also argues that the ALJ improperly weighed other medical opinions and evidence. Plaintiff's argument is persuasive. The ALJ stated that "the record contains no credible or reliable evidence that the claimant has a mental health impairment"; (R. 14), however, every medical expert that provided an opinion regarding Plaintiff's mental or psychological condition found that Plaintiff had some kind of mental health impairment.

While Dr. Friedson noted that there may have been a "validity issue" absent any documentation to substantiate Plaintiff's assertions, he diagnosed Plaintiff with possible psychotic disorder and probable antisocial personality disorder. (R. 339.) At the very least, Dr. Friedson's report that Plaintiff was hostile, belligerent, paranoid and antisocial tends to support some of the other experts' findings. (R. 337-38.) The ALJ did not state what weight he accorded Dr. Friedson's opinion, but considering the ALJ found that Plaintiff had no mental impairment, it seems as if he only credited the portions of Dr. Friedson's opinion that were consistent with his own conclusions.

Dr. Dawkins testified at the first two hearings. (R. 24.) She testified that Plaintiff's medically determinable impairments were schizoaffective disorder as diagnosed by Dr. Castelino and possible psychotic disorder as diagnosed by Dr. Friedson. (*Id.*) She opined that had Dr. Friedson had access to Dr. Castelino's records, he would certainly have diagnosed Plaintiff with schizoaffective disorder. (*Id.*) Dr. Dawkins also made it clear that Plaintiff's condition could have gone untreated for years, and explained that the medical personnel at the Illinois Department of Corrections might not always recognize Plaintiff's mental impairment of treat it if they did recognize it. (*Id.*) The ALJ stated that he appreciated the doctor's testimony about the nature of schizoaffective disorder, but that he "did not credit her unsupported opinion about the supposed inefficacy of the Department of Corrections medical personnel and her speculation about what Dr. Friedman (sic) might have done." (R. 26.) The ALJ accorded the remainder of Dr.

44

Dawkins little weight as he determined that it was entirely based on speculation and on the testimony of Plaintiff and Ms. Bell. (*Id.*)

While some of Dr. Dawkins testimony can be characterized as somewhat speculative, it was a mistake to perfunctorily dismiss her testimony on the possibility that, because of the qualities of schizoaffective disorder, Plaintiff's condition could have gone untreated for years. Also, while Dr. Dawkins testified that the question of whether Plaintiff had been treated in prison for mental illness would not be dispositive of the existence of the impairment,[9] (R. 24), the ALJ treats the absence of records of a mental impairment during Plaintiff's time in prison as functionally dispositive without explaining why the doctor's position lacks reliability on that particular point. (*See, e.g.*, R. 19, 21.) Furthermore, the ALJ's inadequate credibility determinations obviously taint his conclusions regarding the weight Dr. Dawkins opinion deserved.

The ALJ found that the opinion of Dr. Ferrell was unreliable because the doctor based his medical opinion on Dr. Castelino's opinion. (R. 20.) The ALJ stated that Dr. Ferrell credited Dr. Castelino's opinion more than that of Plaintiff's mother, "despite the lack of any mental health treatment during the claimant's incarceration." (R. 20.) It only seems reasonable that Dr. Ferrell would credit another medical expert in his field more than he would a layperson regarding the nature of Plaintiff's mental health; and the Court has already explained the

---

[9] Dr. Ferrell also provided reasons as to why Plaintiff's prison records might not evidence a mental health impairment as serious as schizoaffective disorder. (R. 20.)

problems inherent in Plaintiff's mother's report. Additionally, the Court has already determined that the ALJ's treatment of Dr. Castelino's opinion was improper; it stands to reason that the ALJ's wholesale rejection of Dr. Ferrell's opinion–on the grounds that it was based on Dr. Castelino's opinion–was inappropriate as well.

State Agency consultant Dr, Heinrich found that at the time of his evaluation, there was no longitudinal evidence to support a diagnosis of schizophrenia, and that the Plaintiff's presentation was not consistent with such a diagnosis. (R. 370.) He also determined that the claimant's impairments caused him no limitation in performing activities of daily living, and only moderate limitations in social functioning and in maintaining concentration, persistence or pace. (R. 356.) While Dr. Heinrich's findings would likely not support a finding of disability, it is clear that Dr. Heinrich found that Plaintiff had a mental impairment. (R. 348, 353, 370.) The ALJ stated that he "disagree[d] that the claimant even ha[d] a mental impairment and, *consequently*, accord[ed] little weight to Dr. Heinrich's opinion." (R. 19) (emphasis added). The ALJ's language makes it abundantly clear that his reasoning is flawed: since *he* determined that Plaintiff did not have a mental impairment, little weight was to be accorded to an expert opinion that found that Plaintiff did have a mental impairment. The ALJ is not a mental health professional and cannot reach his own independent psychological determinations. *Chapman v. Barnhart*, 189 F. Supp. 2d 795, 804 (N.D. Ill. 2002) (citing *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996)). Even though his language is not so transparent in other areas of the decision, his treatment of the rest of the expert

opinions makes it seem very likely that the ALJ discounted them, in part, because of his improper independent psychological determinations.

The ALJ failed to consider relevant medical evidence and opinions, and erroneously discounted or selectively credited every expert opinion regarding Plaintiff's mental condition; therefore, the Court concludes that the matter must be remanded to the Commissioner for a thorough consideration of all of the medical evidence in the record and a detailed explanation of why certain evidence was given greater or lesser weight. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)*; Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Commissioner should not assume that any other claimed errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 19] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED:

DATE: <u>March 21, 2012</u>

_____

**HON. MARIA VALDEZ**
**United States Magistrate Judge**